UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
NONGHYUP BANK,
as Trustee for KTB GLOBAL CREDEBT
PRIVATE PROFESSIONAL INVESTMENT
TRUST NO. 40,

     Plaintiff,

  v.

267 BROADWAY OWNERS, LLC,

     Defendant.
----------------------------------------- X

Case No. _____

**COMPLAINT**

**NATURE OF THE CASE**

  1. Plaintiff brings this action to compel defendant, a New York City real estate developer, to comply with the terms of a Loan Agreement that defendant breached by repudiating the express terms of the loan and by refusing to close on the loan. As a result of those breaches, defendant currently owes plaintiff unpaid loan fees of $2.25 million as well as substantial costs and expenses and unpaid interest.

  2. Plaintiff Nonghyup Bank, is the trustee for a Korean investment trust which entered into the Loan Agreement with defendant. Under the Loan Agreement plaintiff agreed to lend, and defendant agreed to borrow, $47.75 million in short-term, bridge financing for the acquisition and development of commercial property at 267 Broadway, New York, New York. Defendant intended to develop the property for foreign investment under the United States' EB5 visa program.

  3. After executing the Loan Agreement, and in response to plaintiff's inquiries, defendant gave plaintiff repeated assurances that it would proceed to close the loan and that plaintiff should accordingly take steps to fund the loan. The parties scheduled February 24, 2020

for the closing in New York.  At the last minute, when plaintiff had already committed funds for the scheduled closing, defendant attempted to back-away from the closing date.  Plaintiff wired the loan funding to escrow, and stood ready to close as scheduled, but defendant failed to close the loan on February 24.

4. Following this first failure to complete the closing, plaintiff engaged with defendant's principal, Mr. Buhm Jung Roe, to discuss how to proceed.  During these conversations, Mr. Roe conceded and agreed that defendant was contractually obligated to plaintiff as of the scheduled closing date of February 24, 2020 and that payment of interest and principal would run from that date.  With that agreement, plaintiff left the loan funding in escrow and also granted defendant significant flexibility and additional time to complete a closing on the property and development rights.

5. Notwithstanding defendant's assurances and the accommodations that plaintiff had provided, defendant failed to complete the closing and then purported to walk away from the parties' agreement.  On the night before the parties' next attempt to close the Loan, defendant demanded to revisit and amend terms of the Loan Agreement that had been settled from the very outset of the parties' discussions.  And the moment that issue was resolved—with plaintiff again accommodating defendant's request—defendant sabotaged the planned closing by repudiating entirely its prior agreement that the Loan was effective as of February 24 and interest was payable from that date.

6. Having repudiated the Loan Agreement, defendant then purported to conduct an attempted closing of the real estate transactions, during the middle of the night in Korea and without providing either the Lender or the Title Company with documents necessary for a successful closing on the Loan.  Within the space of a few hours on the day of this purported

closing, defendant claimed that the sellers had "moved on." Thereafter, defendant refused to discuss the failed purported closing and refused plaintiff's demands that defendant close on the Loan, leaving plaintiff with no choice but to withdraw the loan funds from escrow and to bring this action to compel payment of the substantial fees owing under the Loan Agreement, the interest that defendant expressly agreed to pay, and plaintiff's substantial out-of-pocket costs.

**PARTIES**

7. Plaintiff Nonghyup Bank is a bank established under the laws of Korea with its corporate headquarters in Seoul, Korea. Plaintiff is the Trustee for KTB Global Credebt Private Professional Investment Trust No. 40, a trust established under the laws of Korea, which funded the loan. Nonghyup Bank, in its capacity as trustee, is the lender under the Loan Agreement.

8. Defendant 267 Broadway Owners, LLC (the "LLC") is a New York limited liability corporation created to own and develop property located at 267 Broadway in New York City, and is the borrower under the Loan Agreement. The LLC's business address is 267 Broadway, 2d Floor, New York, New York 10007.

9. Non-party Buhm Jung Roe is the sole member and the manager of the LLC. Mr. Roe is also the principal of non-party, the New York Immigration Fund an EB5 visa program investment entity, with its headquarters at 267 Broadway, 2nd Floor, New York New York 10007. Mr. Roe is resident in New York County.

10. Non-party Hana Financial Investment Company, Ltd. ("Hana") is a leading Korean securities company engaging in commercial and investment banking activities, with its corporate headquarters and registered office in Seoul, Korea. Hana acted as the arranger of the loan to the LLC and, as such, took the leading role, on behalf of the Lender, in business negotiations with Mr. Roe and the LLC.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction under 28 U.S.C. § 1332.

12. Plaintiff Trustee, as well as the Trust for which it acts, have Korean citizenship. Nonghyup Bank is incorporated in Korea and has its corporate headquarters and principal place of business in Seoul, Korea. The Trust, KTB Global Credebt Private Professional Investment Trust No. 40, has two beneficiaries, JonP Company Ltd. and Broadway 1st Company Ltd. These two beneficiaries are limited companies incorporated in Korea and have their principal place of business in Seoul, Korea.

13. Defendant LLC has a single member, Mr. Buhm Jung Roe. Mr. Roe is a United States citizen and is resident in and a citizen of New York State.

14. The amount in controversy, which is in the millions of dollars, exceeds the threshold set forth set forth in 28 U.S.C. § 1332(a).

15. This Court has personal jurisdiction over defendant LLC because the LLC is a limited liability company incorporated under New York law. In addition, defendant consented to personal jurisdiction in New York in the Loan Agreement.

16. Venue is proper in this district under 28 U.S.C. 1391(b)(1) and (2) because defendant LLC has its principal place of business in the district and because the events at issue occurred substantially in the district. In addition, defendant waived objection to venue in the Loan Agreement.

**FACTUAL BACKGROUND**

17. In October 2019, Mr. Roe, initiated discussions with Hana in an effort to secure approximately $50 million in short-term, bridge financing for a scheme to develop real estate located at 267 Broadway in New York City (the "Property").

18. Mr. Roe intended to develop the Property as a project for foreign investment under the United States' EB5 visa program through an affiliated entity the New York Immigration Fund (NYIF). The EB5 visa program enables certain foreign investors to qualify for permanent residency by making domestic commercial investments through approved investment entities. NYIF is a participant in the EB5 investment program and advertises itself as an experienced real estate developer in New York City. The bridge financing was intended to allow Mr. Roe to initiate the project and to enable NYIF to attract EB5 funds that would ultimately repay the loan.

19. Mr. Roe created defendant LLC as a special purpose vehicle to own and develop the Property and borrow the bridge financing.

20. Mr. Roe engaged two business representatives to represent the LLC in these endeavors, Mr. Sungwoo Park in the United States, and Mr. Hoi Rim Lee in Korea. Mr. Park is apparently affiliated with a business calling itself North American Developers. Mr. Lee provides business advisory services in association with a Korean affiliate of the PWC accounting firm.

21. In late 2019, Mr. Roe and Hana negotiated indicative, non-binding terms on which Hana would arrange a loan to fund the project.

22. The transactions Mr. Roe was attempting to finance had two principal components. The LLC would complete the acquisition of the Property from 267 Property Corp. Mr. Roe provided Hana with a purchase agreement, dated December 19, 2019, representing that 267 Property Corp. agreed to transfer the Property to the LLC in return for the payoff of the current mortgage and nominal consideration. Mr. Roe and associates in NYIF own and control at least forty per cent of 267 Property Corp. The LLC would also complete an acquisition of unused development rights ("Air Rights") associated with a nearby property located at 261

Broadway.  267 Property Corp. had entered into an agreement to purchase the Air Rights in 2016, repeatedly amending that agreement to defer a closing.  Mr. Roe provided Hana with a Thirteenth Amendment to an Air Rights purchase agreement, which deferred a closing under that agreement until February 14, 2020.

23.     The loan was to be applied to pay off the current mortgage of $25,000,500 on the Property and to fund the purchase of the Air Rights for an additional $12 million.  Following payment of all fees and costs due to the Lender at closing, remaining funds would be available for development of the Property.

24.     In January and early February 2020, the parties negotiated documentation for a Loan Agreement between defendant LLC as the Borrower, and plaintiff as the Lender, for a Loan of $50,000,0000, as well as related transaction documents.

25.     The Loan Agreement, attached as Exhibit A to this Complaint, provides not only that the Lender will extend the Loan to the Borrower on certain conditions, but that the Borrower is agreeing to borrow the Loan.  Section 2.1.1 of the Loan Agreement, entitled "Agreement to Lend and Borrow" provides:  "Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make, *and Borrower hereby agrees to borrow*, the Loan pursuant to the terms set forth herein" (emphasis added).

26.     The Loan Agreement provides numerous "Conditions precedent to Disbursing Loan Amounts."  Loan Agreement § 3.1(a)-(n).  These conditions are to be "be satisfied and approved by Lender in its sole discretion prior to making the Loan," and accordingly may be waived by the Lender.  *Id.* § 3.1.  The Loan Agreement contains no conditions precedent to the Borrower's obligation to borrow the Loan.

27.     Among the conditions precedent to the Lender's obligations, the Lender was to have received "this Loan Agreement and each of the other Loan Documents, duly executed by the parties thereto," *id.* § 3.1(d)(ii), and the Borrower was to "have acquired those certain air rights set forth in and pursuant to the Air Rights Purchase Agreement." *Id.* § 3.1(m).

28.     The Borrower gave covenants to, among other things, "observe, perform and satisfy all the terms, provisions, covenants and conditions of" the Loan Documents." *Id.* § 5.1.7. Further the Borrower covenanted that:

> Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed.

*Id.* § 5.1.17.

29.     The Borrower is obligated to pay various fees as specified in the Loan Agreement at the time the Loan is disbursed. *Id.* § 5.1.7; *see also* § 3.1(d)(i). In particular, the Loan was subject to an Origination Fee of $2.25 million, which was to be deducted from the loan proceeds but to be repaid by the Borrower as part of the Loan principal. *Id.* § 2.1.4.

30.     The Borrower is also obligated for payment of "all costs and expenses (including reasonable attorneys [sic] fees and disbursements) incurred in connection with," among other things, both "the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby," and "Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan documents on its part to be performed or complied with after the Closing Date." *Id.* § 10.13(a). In addition, the Borrower agreed to indemnify the Lender, among other Indemnified Parties, for losses, costs and expenses,

including reasonable legal fees, "incurred by any Indemnified Party in any manner relating to or arising out of . . . this Agreement and the other Loan Documents, any breach by Borrower of its Obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents." *Id.* § 10.13(b).

31. The Loan Agreement provides that Mr. Roe's entity, the New York Immigration Fund (NYIF), defined in the Loan Agreement as the Preferred Equity Investor, would act as the EB5 visa program investor for the project. *Id.* § 5.1.29 and Definitions. NYIF would, accordingly, be supplying the EB5 funds in which Lender would have a security interest and from which the Loan would ultimately be repaid. *Id.* § 7.3.

32. Various deadlines set forth in the Loan Agreement, including for the payment of interest and principal and for the fulfillment of certain milestones for obtaining the EB5 investments for the project, are keyed to the Closing Date. *E.g. id.* Definitions ("Interest Period," "Payment Date;" § 7.3 (defining EB5 milestones). "Closing Date" is a defined term, referring to the date as stated on the face of the Loan Agreement. *Id.* Definitions.

33. On February 13, 2020, the Borrower, through its New York counsel Hamid Soltani, forwarded signed signature pages for the Loan Agreement and related transaction documents to the Lender's New York counsel Harrison Kaufman, with an instruction that the signatures were to be held in escrow by Mr. Kaufmann's firm and "not be released until authorized by me." The documents as signed by Mr. Roe on behalf of the Borrower were dated "as of February __, 2020." Loan Agreement (Preamble).

34. As the Borrower and its representatives understood, providing the Loan required substantial efforts and expenditure by the Lender parties. The Lender parties would be issuing

notes in Korea to raise the capital for the Loan, and would then have to enter into and maintain positions to hedge the foreign currency risk of extending a substantial loan in U.S. dollars.

35. In the days that followed, Hana made clear to Mr. Roe and the Borrower's representatives that it was important to the Lender to close promptly.

36. In response to Hana's inquiries, the Borrower's representative assured Hana that the Borrower would be closing on the loan and that Hana should complete the capital raise and be ready to fund the escrow.

37. On or about February 20, 2020, Mr. Roe, through his representatives Mr. Park and Mr. Lee, advised Hana that the Borrower was ready to close on the Loan. Also on February 20, Mr. Soltani confirmed in email that his client Mr. Roe "is ready to proceed to a closing." On the same day, Mr. Soltani informed the parties' duly appointed escrow and title insurance agent (the "Title Company") to expect a wire transfer of $47.75 million from the Lender, to be held in escrow pending instruction from the Lender.

38. Relying on the Borrower's assurances that it was ready to proceed, the Lender took steps to initiate the funding of the Title Company escrow account, including by entering into transactions on February 21 in Korea to hedge the foreign currency risk of extending this very substantial loan in United States dollars.

39. On the night of February 20 in New York, Mr. Kaufmann circulated an email to all parties, their representatives and to the Title Company, attaching "the final executed loan documents," including the Loan Agreement, as signed by Mr. Roe and by the Lender's representative, noting that he "would slip in the final dated pages when we have closed." The Borrower parties never objected to the distribution of these documents and never claimed to have placed any conditions on their effectiveness.

40. On Thursday, February 20 in New York (February 21 in Seoul), as the Lender continued to follow up with the Borrower on various open items, the Lender reminded Mr. Roe and his counsel that it would be funding the escrow account to make the funds available on the agreed closing date, Monday February 24 in New York, and that the closing would be that day, regardless of whether the escrow could be broken and the funds disbursed.

41. Contrary to what Mr. Roe had led the Lender to believe, the Borrower was not in a position to close on February 24, or was simply unwilling to close that day. On Sunday February 23 in New York, Borrower's counsel, Mr. Soltani, wrote to the Lender parties stating that he was attempting to finalize certain matters with third parties, and asking for confirmation that no interest would accrue on the escrowed Loan funds, and that "in the event the closing does not occur for any reason the title company may transfer the funds back to Hana without any penalties or interest to Mr. Roe."

42. The Lender promptly advised Mr. Soltani that, to the contrary, the parties had agreed on a February 24 closing date and that interest would begin to accrue from that scheduled closing. In addition, the Lender explained that it had already entered into a foreign currency hedge for the transaction, and that, in light of the time difference between New York and Korea, the Lender could not wait to transfer the funds to escrow, as the closing would be taking place in the middle of the night in Korea.

43. Mr. Soltani then purported to instruct the Lender parties that Mr. Roe did not wish for the escrow to be funded and that no funds should be sent until Mr. Roe requested the funds. The message was copied to among others, Borrower's representative, Mr. Park.

44. After receiving Mr. Soltani's message, which appeared to be inconsistent with the parties' agreement for a February 24 closing, the Lender reached out to Mr. Park and Mr. Lee to

discuss the timeline for funding the loan. In response to the Lender's inquiry, Mr. Park instructed that the Lender should proceed to wire the funds to the Title Company escrow for the scheduled closing. The Lender did as requested and sent the wire. Mr. Soltani then sent further emails in which he stated that the Borrower was not ready to close on February 24 and represented that, contrary to Mr. Park's instruction, Mr. Roe had not requested the funding of the escrow.

45.     The Borrower failed to complete the closing on the scheduled February 24 closing date, or at any time thereafter.

46.     Following the Borrower's failure to close on the appointed closing date, the Lender engaged directly with Mr. Roe, in person, to try to salvage the transaction. Having committed a substantial amount of money to escrow to fund the Loan, and given the inconsistent positions of Mr. Roe's business representatives and his counsel in New York, the Lender was unwilling to proceed without Mr. Roe's agreement that the Borrower was legally obligated to the Lender on the Loan as of February 24. That issue was a central question in the Lender's discussions with Mr. Roe.

47.     On or about March 1, 2020, in the course of these discussions, Mr. Roe personally confirmed that he would close on the Loan and conceded and agreed that the Loan was effective as of February 24, that interest was accruing on the Loan from February 24, and that all principal was to be paid by November 24, 2020, exactly as required by the Loan Agreement. *See* Loan Agreement § 2.3.4 ("Payment on Maturity Date"), Definitions (defining Maturity Date as "November __, 2020" six months after the effective date of "February __, 2020"). In these same conversations, the Lender agreed to allow Mr. Roe to close on the Property and Air Rights in two separate steps, rather than at a simultaneous closing, and to borrow $4 million from the Air

Rights sellers to finance part of the Air Rights purchase.  The Lender promptly advised Borrower's counsel of this agreement in writing, copying all parties and their representatives, without objection from the Borrower.  Indeed, Borrower's counsel twice confirmed in writing that the Borrower had agreed to pay interest from February 24.

48. By the week of March 9, it appeared that Mr. Roe was finally prepared to conclude the Loan closing that week.  Mr. Roe represented through counsel that he was scheduled to close on the Air Rights purchase and the Property on or around March 12, and that the Air Rights sellers were currently working to complete the documentation for that sale.

49. On March 12, however, with the Borrower ostensibly working to close the next day in New York, and when it was already evening in Seoul, Mr. Roe attempted to raise a new roadblock, demanding to change a fundamental term of the parties' deal.  From the outset of negotiations in 2019, it had been the parties' shared understanding that Mr. Roe's investment entity, NYIF, would be the EB5 investor in the project.  Nonetheless, at the last minute, Mr. Roe insisted that the Loan Agreement's definition of Preferred Equity Investor should be amended to allow any licensed EB5 investment entity, not just NYIF, to invest in the project.

50. The Lender had numerous grounds to object to this last-minute change in terms.  It pointed out that Mr. Roe had signed a written undertaking, on behalf of NYIF, dated October 19, 2019, in which NYIF agreed that NYIF would raise the EB5 Fund for the 267 Broadway project and that the Loan Agreement had already been through investment committee approval and been registered with regulatory authorities in Korea, specifically, the Financial Supervisory Service of Korea, on that basis.  Nonetheless, the Lender once again provided Mr. Roe with the flexibility he had requested, and worked through the early hours of the morning in Seoul to respond to Mr. Soltani's wordsmithing of the Preferred Equity Investor provision.

51. No sooner was that issue resolved, however, than Mr. Roe raised a new objection to the Loan Agreement. His counsel now contended that, notwithstanding the parties' prior agreement on the February 24 effective closing date, the milestones for raising EB5 funds set forth in the Loan Agreement must run from March 13, not from February 24. The Lender responded that the parties had already agreed on February 24 as the effective closing date, and that the EB5 milestones should run from that date as the agreement provided. Accordingly, the Lender instructed its New York counsel, Mr. Kaufman, to update the loan documents for the closing with a February 24 effective date for the Loan.

52. Late in the morning of March 13, the planned closing date, Mr. Soltani wrote an email to the Lender parties repudiating Mr. Roe's prior agreement to be bound by the February 24 closing date. He stated that Mr. Roe "will not agree to the February 24 date" and complained that the Lender should not have funded the escrow on February 24—the issue the parties had resolved weeks before, memorializing their agreement in writing shared with the entire group. This time, the Borrower's attempt at sabotage was successful, and the closing did not proceed on March 13.

53. Over that weekend, the Lender reached out to Mr. Roe and discussed the Milestone issue with him personally. The Lender explained that it was willing to modify the Borrower's EB5 milestone obligations, but asked that the parties address that modification after the closing rather than delay further. Mr. Roe responded that he needed to consider the issue.

54. On the night of Sunday, March 15 in New York, Mr. Soltani abruptly announced that the Borrower was "ready to close" the next day, but again expressly repudiated the Borrower's prior agreement on the effective date of the Loan. Although Mr. Soltani had twice expressly confirmed in writing that Mr. Roe agreed to pay interest from February 24, he now

stated that neither the Borrower's interest obligation, nor any other obligation could run from that date. Mr. Soltani suggested that if this repudiation of his client's prior agreement "was problematic" the parties should arrange a conference call to discuss the issue, as he needed to resolve it before the morning in New York.

55. On March 16, in the space of just a few hours, after a month of prevarication and obstruction and after expressly repudiating the parties' agreement, Mr. Roe purported unilaterally to conduct an attempted closing of the real estate transactions in New York, asserted that the Lender had prevented him from closing, and represented that the sellers had "moved on" and that he would no longer close on the Loan. All of this took place during the middle of the night in Korea and after Mr. Roe had just repudiated the Loan Agreement under which the parties had been proceeding for weeks, effectively guaranteeing that he would be unable to close either real estate transaction that day.

56. The purported March 16 closing was no more than a charade, undertaken in bad faith to provide the Borrower with a pretext for walking away from the Loan Agreement. The Borrower had not taken basic steps required for a closing on March 16. For instance, except for a copy of a proposed covenant to be recorded against the Property as part of the Air Rights purchase, the Borrower had not provided purchase or loan documents for that transaction for review by the Lender. The Borrower had not provided the documents required to complete the purchase of the Property from 267 Broadway Corp to the Lender or the Title Company. And the Borrower had not provided a final Closing Statement which was required before the Title Company could disburse loan proceeds. In sum, Mr. Roe had provided the Lender with no documents evidencing that Borrower intended to close or would be obliged to close on either the Property or the Air Rights purchase on March 16.

57. Moreover, Mr. Roe knew that his last-minute repudiation of the parties' agreement on the effective date of the Loan guaranteed that there would be no loan closing and therefore no closing of the real property transactions on March 16. The parties had proceeded for weeks on the express understanding that the Loan was effective as of February 24 and that the Borrower owed interest from that date.

58. The Lender made repeated attempts to speak with Mr. Roe about the failed closing but Mr. Roe refused to discuss the matter. He provided no explanation for the events of March 16, and no information concerning his counsel's representation that the sellers had "moved on."

59. On March 26, the Lender wrote to Mr. Roe advising that the Borrower's unilateral decision not to close the Loan was in breach of the Loan Agreement. The Lender asked the Borrower to confirm, within 24 hours, that it would proceed with the closing. The Lender also noted that it was incurring significant costs with respect to the funds on deposit with the escrow agent and that unless the Borrower confirmed that it would close, the Lender would have no choice but to withdraw the funds from escrow to mitigate its damages. The Borrower failed to respond.

60. On March 30, the Bank informed the Borrower that the funds were being withdrawn from escrow.

61. The Borrower's failure to close on the loan in breach of the Loan Agreement has deprived the Lender of the Origination Fee of $2.25 million, the interest it expected to earn on the Loan, and the payment of Lenders' fees and costs owing under the Loan Agreement. In addition, as a direct result of the Borrower's false assurances that it would close on the loan and

pay interest from February 24, the Lender has incurred out-of-pocket costs of $1.355 million and has been deprived of interest payments of $320,000.

## COUNT I
## Breach of Contract

62. Plaintiff repeats and incorporates each allegation set forth above as if specifically set forth here.

63. The Loan Agreement is a valid and enforceable contract. The Loan Agreement was enforceable as of February 24, 2020 after Defendant confirmed, in writing, that it would proceed with the Loan closing and the executed Loan Agreement and other Loan Documents were circulated to the parties and Title Company for the agreed upon February 24, 2020 closing.

64. Further, on or about March 1, 2020, defendant agreed to and ratified the enforceability of the Loan Agreement as of February 24, 2020.

65. Defendant further ratified the enforceability of the Loan Agreement by its conduct after March 1, 2020.

66. Plaintiff fully complied with its obligations under the Loan Agreement.

67. There are no conditions precedent to Defendant's obligation to borrow under the Loan Agreement.

68. Defendant was, therefore, contractually obligated to close on the Loan and to pay all fees and costs payable at closing.

69. Defendant breached its obligation to borrow by failing to close on the Loan and by repudiating its obligations under the Loan Agreement even after Lender specifically demanded that Defendant proceed with a closing.

70. Section 8.2.1 of the Loan Agreement provides that, with certain exceptions, Plaintiff's remedy for breach of the Loan Agreement is an order of specific performance.

71. Plaintiff was ready, willing and able to perform under the Loan Agreement, and remains ready, willing and able to fund the Loan and distribute the proceeds on the terms agreed in the Loan Agreement.

72. Accordingly, Plaintiff is entitled to an order of specific performance requiring that the Borrower (i) close on and borrow the Loan, (ii) pay all fees and costs payable at closing under the Loan Agreement, (iii) apply the Loan for the purposes and on the terms set forth in the Loan Agreement, and (iv) pay principal and interest as provided under the Loan Agreement from February 24, 2020.

73. Because the Borrower refused to discuss the circumstances of its failure to close, the Lender has had no information from which it can evaluate whether specific performance remains practicable. To the extent that full specific performance of the Loan Agreement would be impracticable, Plaintiff is entitled to an order of partial specific performance, ordering Defendant to pay the Origination Fee, other fees and costs payable at closing, and applicable interest or penalties under the Loan Agreement from February 24, 2020, or to damages in lieu of specific performance in an amount be proven at trial.

74. Further, under Sections 10.13(a) and (b) of the Loan Agreement, Plaintiff is entitled to all of its costs and expenses, including reasonable attorneys' fees, in connection with Defendant's breach of the Loan Agreement and the enforcement of Plaintiff's rights under the Loan Agreement.

## COUNT II
### Promissory Estoppel

75. Plaintiff repeats and incorporates each allegation set forth above as if specifically set forth here.

76. On or about February 20, 2020, through representatives in Korea and the United States, defendant assured plaintiff that defendant would proceed to close on the Loan and requested that Plaintiff complete the raise of required capital and fund the escrow account for a closing.

77. In reliance on defendant's assurances, plaintiff took the necessary steps to close the Loan, including by raising capital, entering into the foreign currency hedge, funding the escrow account with $47.75 million and proceeding with final diligence for a closing.

78. Plaintiff's reliance was reasonable. Indeed, defendant knew that plaintiff was initiating the funding of the escrow account for defendant's benefit because of the assurances that defendant had provided.

79. Thereafter, defendant assured plaintiff that it would pay interest on the Loan effective as of February 24, 2020, as defendant has specifically requested. In reliance on defendant's assurances, plaintiff maintained the $47.75 million in loan funding in an escrow account for defendant's benefit, and undertook additional legal and administrative expense to facilitate the promised closing.

80. Plaintiff's reliance was reasonable. Indeed, defendant knew that plaintiff was only willing to maintain the escrow and to continue working to close the Loan because of defendant's promises to close and to pay interest from February 24, 2020.

81. Defendant unjustifiably and in bad faith refused to close on the Loan as it had promised to do, and repudiated its promise to pay interest as of February 24, 2020.

82. As a direct result of plaintiff's reliance on defendant's assurances, plaintiff has suffered losses amounting to at least $1.355 million in out-of-pocket costs and $320,000 in unpaid interest.

83.     Plaintiff is entitled to judgment for its out-of-pocket costs and interest on the Loan for the period February 24 to March 30, 2020.

## RELIEF REQUESTED

WHEREFORE, plaintiff Nonghyup Bank respectfully requests that this Court:

A.      Order defendant to specifically perform the Loan Agreement by (i) closing on and borrowing the Loan, (ii) paying the fees and costs payable at closing under the Loan Agreement, (iii) applying the Loan for the purposes and on the terms set forth in the Loan Agreement, and (iv) paying principal and interest as provided under the Loan Agreement from February 24, 2020 or, in the alternative, enter an appropriate order for partial specific performance of the Loan Agreement, or award damages in lieu of specific performance in an amount to be determined at trial.

B.      Award plaintiff its costs and expenses, including reasonable attorneys' fees, due to plaintiff under Sections 10.13(a) and (b) of the Loan Agreement.

C.      Award plaintiff its out-of-pocket costs together with interest on the Loan for the period from February 24, 2020 to March 30, 2020.

D.      Award pre-judgment interest as required by statute.

E.      Grant such other relief as the Court finds to be just and proper.

Dated: November 3, 2020
       New York, New York

Respectfully submitted,

COOLEY LLP

By: /s/ Ian Shapiro
    Ian Shapiro
    Reed A. Smith
    Alan Levine

55 Hudson Yards
New York, New York  10001-2157
Telephone:  (212) 479-6000
Email: ishapiro@cooley.com
       reed.smith@cooley.com
       alevine@cooley.com

*Attorneys for Plaintiff*